**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| **Joshua Pratt,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Complaint** |
| ) | **42 U.S.C. § 1983** |
| **City of Greenville** ) | |
| ) | **(Jury Trial Demanded)** |
| **and** ) | |
| ) | |
| **Kenneth Miller, in his individual** ) | |
| **capacity,** ) | |
| ) | |
| **Defendants.** ) | |

Plaintiff would show unto this Court as follows:

### Introduction

Defendants terminated Plaintiff's employment as a police officer after he spoke out about serious issues within the City's Police Department, including the lack of command and direction during the recent Black Lives Matter protests. During those protests, Plaintiff was choked by a protester. Plaintiff expressed his concerns about public safety and operation of the Department, both in departmental meetings and in discussions with members of City Council. After Plaintiff and other officers exercised their First Amendment rights, Defendant Miller threatened officers with discipline for speaking out, and directed an internal affairs investigation of Plaintiff over an immaterial paperwork discrepancy. Defendants improperly suspended Plaintiff, refused Plaintiff's repeated request to take a

polygraph examination to prove his truthfulness, vetoed Plaintiff's selection for a chain of command hearing to review the matter, made baseless, prejudicial, and outrageous assertions against him during a hearing, and terminated his employment for pretextual reasons.

### Parties

1.    Plaintiff is a citizen of Greenville County, South Carolina.

2.    The City of Greenville ("City" or "Greenville"), South Carolina is a municipality situated in Greenville County, South Carolina.

3.    Defendant Kenneth Miller is the Chief of Police for Greenville.

4.    Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

### Jurisdiction and Venue

5.    This Court has jurisdiction over the matters raised herein pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 and venue is appropriate in this District and Division because the acts complained of occurred in Greenville County, South Carolina.

### Background

6.    Plaintiff previously served as a officer for the City.

7.    On July 8, 2016, a large group of persons, self-identifying as part of the Black Lives Matter movement, began an unlawful and disruptive series of protests in Downtown Greenville.  The group never secured permission or necessary permits for the demonstrations.  These demonstrations began the night after the deadly shooting of police officers in Dallas, Texas during Black Lives Matter protests.

8.    On the first evening of the protests, the marchers disrupted traffic and proceeded to NOMA square where citizens were trying to enjoy the Main Street Jazz event. The protestors took over the stage of the event and forced the crowd to listen to their protest.  The protesters then continued their march through downtown, ignoring police commands as to where they could march, and forcing police to shut down intersections.

9.    On the second night of the protests, July 9, 2016, protesters staged a sit in at Beattie and North Main, disrupting traffic.   They then announced their goal of taking over I-385 and shutting it down.   Plaintiff and other officers were instructed to form a line in the vicinity of the Bon Secours Wellness Arena by Williams/Academy Street.  However, few commands were given and officers were unsure of what they could do in terms of preventing the marchers from overtaking them.  Commanding officers at the scene seemingly did not know whether to issue orders, or what orders to issue.  While police had riot gear at their disposal, nobody ever instructed the officers to deploy the gear and, in fact, never trained officers on its use despite the fact that the equipment was issued in 2015.

10.    As the protesters approached the police line, the situation predictably became more dangerous and confrontational.  One protester in particular, Dexter Scarborough, broke through the police line and attempted to incite others to break through the police line and take over I-385.  Because nobody was issuing commands, Plaintiff was forced to ask the commanding officer, who witnessed Scarborough's actions,

whether Scarborough should be arrested.  Plaintiff was told that, if he needed to arrest Scarborough, to do so.

11.     Plaintiff attempted to arrest Scarborough, at which point Scarborough choked Plaintiff.    After Plaintiff escaped Scarborough's choke hold, Plaintiff tased Scarborough twice before Scarborough could be subdued and taken into custody. Plaintiff was injured during the scuffle.  The attack on Plaintiff was so serious that the attacker has been charged with, among other things, attempted murder, assault and battery on police, and resisting arrest.

12.     Derrick Quarles, the purported head of Greenville's Black Lives Matter group, and the individual who orchestrated the attempt to seize I-385 was charged only with pedestrian in the roadway and public nuisance.  The vast majority of protesters that disturbed events downtown and disrupted traffic suffered no consequences whatsoever.

13.     The City's handling of the Black Lives Matters protest and the assault on Plaintiff itself generated considerable and immediate public discussion, as well as extensive and coverage in the media.  Discussion of the issue became so prevalent that the City issued a press release and held a press conference to discuss the issues and explain the decisions made.

14.     Plaintiff requested that Defendant Miller address Plaintiff's platoon regarding the protests and the manner in which they were handled by the City.

15.     On July 13, Defendant Miller addressed Plaintiff's platoon to discuss the decisions made about the handling of the protests and the attack on Plaintiff.  Plaintiff spoke

out during the meeting and voiced the opinion to Defendant Miller and others that there was a lack leadership and command, that the Department looked weak to the community, that there are many comments posted that were negative as the handling of the protests, and that the officers did not know what to do.   Defendant Miller acknowledged that there was a lack of direction and command given at the scene.  Plaintiff also spoke out about the lack of training on the gear needed to confront such protests and on issues of officer pay and benefits.

16.    On or about July 15, Plaintiff and other officers met with two members of City Council to discuss concerns regarding the Department, the manner in which services are provided by the City, and the safety of the public and the officers. Specifically, Plaintiff and others discussed:

a.    Starting pay and increases for officers and spending priorities of the City;

b.    the lack of leadership during the protests and the dangerous situation it created;

c.    the failure of the City to train officers on the use of riot gear as promised;

d.    morale in the department and the fear of discipline;

e.    operation of City Court and the manner in which the City Judge is perceived and handles cases;

f.    the resources focused on special division capabilities;

g.    the unavailability of body cameras;

h.    perception of the Department by other law enforcement agencies, including the Sheriff's Department; and

l.    the potential loss of officers to other departments because of disenchantment within the Department.

17.    Word of the discussion between Plaintiff and others and the members of council spread quickly and Plaintiff was informed that officers were being questioned as to who spoke with members of Council.

18.    Approximately twelve days after Plaintiff spoke with Council, he was subjected to an internal affairs investigation as a result of a purported citizen complaint about an arrest in Nicholtown in which Plaintiff was involved during the early morning hours of July 5, 2016 ("Nicholtown Incident").  Early that morning, Plaintiff and another officer were in the street when one or more persons attending a gathering shot fireworks in the direction of the officers.  The fireworks almost struck two pedestrians.  Plaintiff and his partner attempted to address the issue, which was complicated by the movement of numerous people and the hostility of at least some of them to the presence of the officers, including one individual who yelled "Fuck Officer Jacobs" at Plaintiff and his partner.  This vulgarity was an obvious reference to the recent murder of Officer Allen Jacobs in Nicholtown.  The crowd included individuals known to the officers as being involved in gang activity.

19.    Plaintiff was informed of the Internal Affairs investigation and the allegation of misconduct by way of Memorandum dated July 19, 2016.  The Memorandum advised Plaintiff as to specific allegations made by a citizen, who was arrested by another officer during the Nicholtown Incident.

20.    At the conclusion of the Internal Affairs interview, the Sergeant in charge told Plaintiff that he was subjected to the interview only because of the "current climate" and that the Department just wanted to prove that it investigated.  The Sergeant characterized the complaint as "bullshit."   Defendants eventually exonerated Plaintiff of the complaint that gave rise to the investigation.

21.    Defendant Miller became aware of the discussion between officers and City Council members and openly expressed his anger about such discussions.  Just two days after the internal affairs investigation interview, Defendant Miller issued an e-mail to the Department in which he made clear his disdain for any discussions between officers and elected officials, which he described as a violation of policy.  Defendant Miller stated that he was not investigating or issuing discipline over the discussions only because members of Council did not file a complaint.  Defendant Miller accused those involved of circumventing the chain of command, even though the issues addressed with the Council members were discussed with Defendant Miller and others during the July 13 platoon meeting.  Defendant Miller wrote:

>    Employee Complaints to City Council Members
>
>    It is my understanding that several employees recently visited with a couple of City Council members to air some concerns on their minds.  I am also aware of the City policy that requires employees to use and exhaust their respective chains of command to address concerns, grievances and complaints.
>
>    On its face, this appears to be a violation of City policy.  But further examination reveals that the Council members have not initiated any complaint or investigation and should have informed the employees to use the chain of command structure to address their concerns, so I do not see the need to investigate and discipline employees over the matter.  It is

difficult to govern every aspect of a Council member's interaction with an employee or visa-versa, and it would be imprudent to limit their interactions with employees.

However, efforts to undermine the chain of command or any member within it, or to undermine the operational processes and good working order of the department would be a problem and would be demonstrated by calls for investigation or action from a Council member.  To avoid these conflicts and the disciplinary problems they can cause for employees, I would again encourage you to use your respective chains of command to address problems or concerns, rising successively through your supervisors, commanders, me and the City Manager, prior to addressing your grievances with members of City Council.

(Exh. A (emphasis added)).

22.    Plaintiff began hearing rumors that the officers that participated in the meeting with

council members were being investigated.

23.    Within days, Plaintiff was again hailed into Internal Affairs on August 2, 2016,

ostensibly about the allegations contained in the July 19, 2016 Memorandum.  It is

clear from the circumstances, described below, that Defendant Miller personally was

directing the Internal Affairs investigation.  Defendants did not question Plaintiff

about the issue outlined in the July 19 Memorandum.  Rather, they questioned him

about a different arrest that occurred during the Nicholtown Incident.  Specifically,

they questioned Plaintiff about a discrepancy between the narrative in another

arrest warrant and Plaintiff's written report, which were written hours after the arrest.

Plaintiff was not given any notice that there was any other concerns raised by

anyone regarding the Nicholtown Incident, or an opportunity to prepare to answer

questions regarding the details of this issue, which occurred almost a month earlier.

In any event, the perceived discrepancy in the paperwork was immaterial to the charges Plaintiff brought against the particular subject, which was possession of marijuana. During the incident, Plaintiff's partner searched a backpack after he saw the subject throwing a backpack. The officer found marijuana and identification for the subject. After being given his *Miranda* rights, the subject confessed that the marijuana was his. Plaintiff arrested the subject and charged him with possession of the marijuana. The confusion in the paperwork related to whether the individual earlier ran from the officers, but he was not charged with an offense related to that.

24.  At the conclusion of the second interview, Plaintiff was placed on immediate administrative suspension while on duty. Upon information and belief, such action is reserved only for exigent circumstances.

25.  Under the City's policies, Plaintiff is entitled to a "chain of command" hearing to review the allegations. Plaintiff also was entitled to choose a peer member of the panel from among names provided to him by the City.

26.  On August 11, Plaintiff visited the Department to review the file and submit his choice for the peer on the chain of command hearing panel. After reviewing the file, Plaintiff requested the opportunity to take a polygraph as it was clear that his veracity was being questioned in terms of the statements he made on the paperwork. Defendants did administer a polygraph to Plaintiff's partner involved in the the Nicholtown Incident. The Sergeant and Captain present told Plaintiff they would take his request for a polygraph exam to Defendant Miller. After a lengthy delay, which Plaintiff approximates as being 1 ½ hours, the Sergeant and Captain

returned from their meeting with Chief Miller.  They informed Plaintiff that Defendant

Miller was refusing Plaintiff's request to take a polygraph.  Moreover, they informed

Plaintiff that Defendant Miller had vetoed Plaintiff's selection for the chain of

command hearing which, upon information and belief, he has no right to do.

Plaintiff questioned why he was not being permitted to take a polygraph.  The

Sergeant in charge of Internal Affairs specifically told Plaintiff that it was

unnecessary.

27.     Plaintiff reiterated, in writing, his request to take a polygraph exam.  (Exh. B).  On

August 12, Defendant Miller denied the request in writing.  He wrote that a test

specifically designed to determine whether an individual is being truthful was not

necessary:

> I do not see that such an exam is necessary or appropriate in
> your circumstance.  The facts related to your allegations are
> not conflicting in a manner that would support the need for a
> polygraph exam.  In addition, polygraph examinations are not
> designed to help us distinguish intentions from actions, so I
> believe it would be of little value in this matter.

(Exh. C).

28.     Three days after Defendant Miller denied Plaintiff's second polygraph request,

Defendant Miller convened the chain of command hearing.  Defendant Miller stated

that procedure dictated that the questioning commence with the lowest-ranking

member so that there would be no undue influence caused by higher-ranking

members directing the discussion or expressing opinions.   Contrary to this

procedure, however, Defendant Miller interjected and directed the discussion.   In

short, Defendant Miller not only refused to allow Plaintiff a peer selection of his choice, he then directed the conversation in a biased and prejudicial manner, leading to a pre-destined result.  For example, during the hearing, Defendant Miller stated that he thought Plaintiff was possibly acting out of a belief that the individuals at the Nicholtown Incident were celebrating the murder of Officer Jacobs, and that Plaintiff was trying to get his "pound of flesh" by arresting some.  This groundless and outrageous accusation was not even related to the issues supposedly being investigated.

29.    The purported wrong Plaintiff committed, according to Defendants, was that he relied on facts provided by his partner and did not limit his affidavit to things he personally observed.  This is contrary to settled law as has been explained to Plaintiff and as outlined by the South Carolina Attorney General.  See November 2, 2015 Attorney General Letter to Honorable Dana Turner.  (Exh. D).

30.    After denying Plaintiff the ability to take a polygraph, and after Internal Affairs specifically told Plaintiff that the Sergeant did not find any untruthfulness on Plaintiff's part, Defendants terminated Plaintiff for the "egregious violations" of being "untruthful" and for "intentional deception."   Specifically, Defendants informed Plaintiff, in writing, as follows:

> In the analysis of your situation, the Chain of Command determined that your untruthfulness on the affidavit and subsequent unlawful arrest were a result of intentional deception on your part. The Chain of Command also concluded that your subsequent statements to Internal Affairs personnel investigating the allegations were deceptive. Consequently, intentional untruthfulness is an egregious

> violation that can undermine the very public support and trust
> we rely upon to conduct our work and ensure that we are safe
> and supported in doing it.

(Exh. E (emphasis added)).

31.   Defendants' knowingly-false accusations that Plaintiff was untruthful and deceptive are a mere ruse to justify termination as there is no evidence to support the notion that Plaintiff even had a motive to engage in such conduct, and certainly none to suggest that he did so.

32.   Plaintiff's partner during the Nicholtown Incident did not participate in the discussions with Council members and did not speak out during the platoon meeting.  Unlike Plaintiff, he was given a polygraph test, was not falsely accused of wrongdoing, and he was not terminated from employment.

33.   Defendants' actions were willful and without regard to the protected rights of Plaintiff.

**Count I**
**For a First Cause of Action**
**Retaliation - Freedoms of Speech, Petition, and Association**
**U.S. Constitution Amendments First and Fourteenth**
**S.C. Constitution Art. I § 2**
**42 U.S.C. § 1983**

34.   Plaintiff incorporates by reference the foregoing allegations as if set forth here in full.

35.   Plaintiff's exercise of his free speech, petition, and associational rights were the cause of Defendants' retaliation, including the termination of Plaintiff's employment.

36.   Defendants' actions were intended to and had the effect of retaliating against Plaintiff, of chilling the exercise of his rights and the rights of others to speak on

mattes of public concern, to petition the government, and to associate with others for the purpose of expressing views on matters of paramount public concern.

37. Defendants, individually and acting in concert, deprived Plaintiff of his rights, privileges, or immunities secured by the Constitution and laws of the United States and the State of South Carolina.

38. Plaintiff and the others spoke as private citizens on these matters of public concern as duties of a police officer do not include engaging in discussions with individual members of City Council or in speaking out during meetings with Defendant Miller. In fact, as discussed more fully below, Defendants have adopted as a policy, custom, and practice a prohibition against officers speaking out on matters of public, which forecloses any notion that Plaintiff was acting in his capacity as a police officer when he spoke out.

39. Plaintiff and others presented their issues in a professional and non-disruptive manner. In fact, both council members thanked the officers, reassured them, and invited further input. Nothing about Plaintiff's actions disrupted the harmony of the department, impaired operations, impeded the ability of any official to carry out his or her legitimate duties, or otherwise constituted an abuse of Plaintiff's position.

40. The prohibition against retaliation for the exercise of free speech, petition, and association rights has been well established in controlling case law such that any official in Defendant Miller's position is on notice of it. *Durham v. Jones*, 737 F.3d 291, 303-04 (4th Cir. 2013); *see Borough of Duryea v. Guarnieri,* 564 U.S. 379, 397-98 (2011); *Connick v. Myers*, 461 U.S. 138, 142 (1983); *Love-Lane v. Martin*, 355 F.3d 766, 779 (4th Cir. 2004); *Mansoor v. Trank*, 319 F.3d 133, 139 (4th Cir.

2003) ("The Supreme Court articulated the principles governing this case in Pickering, decided in 1968, and Connick, decided in 1983." ); *Goldstein v. Chestnut Ridge Fire Dept.*, 218 F.3d 337, 351-52 (4th Cir. 2000) (citations omitted); *Edwards v. City of Goldsboro*, 178 F.3d 231, 245-46 (4th Cir. 1999) (citations omitted); *Cutts v. Peed*, 17 Fed. Appx. 132, 136 (4th Cir. 2001); *see also Rankin v. McPherson*, 483 U.S. 378, 384 (1987)("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions, but simply because superiors disagree with the content of employees' speech.").

41.     The prohibition against retaliation is well established, even in cases in which the speech is expressed internally within the governmental entity. *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 415-16 (1979); *Cromer v. Brown*, 88 F.3d 1315, 1326 (4th Cir.1996) ("Public employees do not forfeit the protection of the Constitution's Free Speech Clause merely because they decide to express their views privately rather than publicly."); *see also Garcetti v. Ceballos*, 547 U.S. 410, 420-21 (2006) ("That [plaintiff] expressed his views inside his office, rather than publicly, is not dispositive."); *Goldstein*, 218 F.3d at 353-54 (private reports protected) (citing *Cromer*).

42.     The City's policies, as implemented by Defendant Miller, were the moving force behind the deprivation of Plaintiff's rights and Defendants acted with deliberate indifference to Plaintiff's rights.

43.    Plaintiff's exercise of his Constitutional rights was a substantial factor in the decision to suspend and terminate Plaintiff's employment.

WHEREFORE, Plaintiff requests a trial by jury on his Section 1983 claim and the award of all equitable and legal relief available including, but not limited to:

    a.    compensatory and actual damages including, but not limited to, back pay, front pay, benefits, and emotional distress;

    b.    punitive damages;

    c.    attorney fees and costs;

    d.    prejudgment and postjudgment interest;

    e.    injunctive relief;

    f.    declaratory relief;

    g.    all other relief necessary to redress the acts and omissions complained of herein.

## Jury Demand

Plaintiff requests a trial by jury as to all issues of liability and damages.

Respectfully submitted this 7th day of September, 2016.


                                s/ Brian P. Murphy                       
                                Brian P. Murphy
                                Fed I.D. No. 6405

Stephenson & Murphy, LLC
207 Whitsett Street.
Greenville, SC 29601
phone: 370-9400
fax:     240-9292                                Attorney for the Plaintiff